**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**BOBBY COOPER and BOBBY HARVISON,**
**individually and on Behalf of All** **PLAINTIFFS**
**Others Similarly Situated**

**v.** **Case No. 5:26-cv-05086-TLB**

**WALMART INC.** **DEFENDANT**

**FIRST AMENDED COMPLAINT - CLASS ACTION**
**JURY TRIAL DEMANDED**

Plaintiffs Bobby Cooper and Bobby Harvison ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, bring this action against Defendant Walmart Inc. ("Defendant" or "Walmart"). The allegations contained herein are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions, counsel's investigation, and information and belief as to all other matters.

## NATURE OF THE CASE

1. This class action arises from Walmart's retention of windfall profits generated by unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq.

2. Beginning in February 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of IEEPA. Those tariffs dramatically increased the cost of imported consumer goods sold in the United States.

3. Major U.S. importers, including Walmart, responded by increasing prices on consumer goods to offset the cost of these tariffs. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.



**Exhibit A**

4. On February 20, 2026, the Supreme Court of the United States held that the IEEPA-based tariffs were unlawful. *Learning Resources, Inc. v. Trump*, 2026 U.S. LEXIS 714, 146 S. Ct. 628 (2026).

5. As a consequence of that decision, importers who paid those tariffs, including Walmart, became entitled to refunds of duties they previously paid to U.S. Customs and Border Protection ("CBP").

6. The economic reality of the tariffs, however, is that importers like Walmart do not ultimately bear all tariff costs. Instead, importers passed the elevated costs on to consumers in the form of higher retail prices.

7. Walmart therefore collected tariff costs from consumers through elevated prices while simultaneously seeking refunds of the same tariff payments from the federal government.

8. On April 8, 2026, while attending a JPMorgan Retail Round Up, Walmart's Chief Financial Officer stated, "We'll certainly avail ourselves of the opportunity that we have to get a refund, but when that happens, remains to be seen."

9. Walmart has made no legally binding commitment to return tariff-related overcharges to the consumers who actually paid them.

10. Unless restrained by this Court, Walmart stands to recover the same tariff payments twice: once from consumers through higher prices, and again from the federal government through tariff refunds, including interest paid by the government on those funds.

11. This lawsuit seeks to prevent that unjust result.

12. Plaintiffs bring this action on behalf of consumers who purchased tariff-affected goods at physical Walmart stores during the tariff period and paid inflated prices reflecting Walmart's pass-through of unlawful tariffs.

13. Plaintiffs seek restitution of those tariff overcharges, together with appropriate declaratory, injunctive, monetary, and other relief.

## JURISDICTION AND VENUE

14. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed Class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

15. The Court has personal jurisdiction over Defendant because Walmart is headquartered in this District, conducts substantial business in this District, and the wrongful conduct occurred in and emanated from this District.

16. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant's principal place of business is located in Bentonville, Arkansas, and a substantial portion of the events and conduct giving rise to the claims occurred in the Western District of Arkansas.

## PARTIES

17. Plaintiff Bobby Cooper ("Cooper") is a resident and citizen of Olive Branch, Mississippi, and a customer of Walmart. During the Class Period, Cooper purchased goods in person at physical Walmart retail stores that were imported from countries subject to the IEEPA tariffs. Cooper paid retail prices for those goods, which Walmart increased to account for tariffs imposed on imported products. Cooper would not have paid those higher prices absent the unlawful tariffs and Walmart's pass-through of those tariffs to consumers.

18. Cooper is not a Walmart+ member. At all relevant times, Cooper did not purchase Walmart goods through Walmart.com, the Walmart mobile application, Walmart+, Walmart Pay, Scan & Go, pickup, delivery, or any other Walmart digital ordering or checkout platform. Cooper

does not base any claim in this action on an online or digital Walmart transaction and did not assent to Walmart's online Terms of Use or any arbitration provision in connection with the qualifying purchases at issue.

19. Plaintiff Bobby Harvison ("Harvison") is a resident and citizen of St. Francis County, Arkansas, and a customer of Walmart. During the Class Period, Harvison purchased goods in person at physical Walmart retail stores that were imported from countries subject to the IEEPA tariffs. Harvison paid retail prices for those goods, which Walmart increased to account for tariffs imposed on imported products. Harvison would not have paid those higher prices absent the unlawful tariffs and Walmart's pass-through of those tariffs to consumers.

20. Harvison is not a Walmart+ member. At all relevant times, Harvison did not purchase Walmart goods through Walmart.com, the Walmart mobile application, Walmart+, Walmart Pay, Scan & Go, pickup, delivery, or any other Walmart digital ordering or checkout platform. Harvison does not base any claim in this action on an online or digital Walmart transaction and did not assent to Walmart's online Terms of Use or any arbitration provision in connection with the qualifying purchases at issue.

21. Defendant Walmart Inc. is an Arkansas corporation with its principal place of business at 1 Customer Drive, Bentonville, Arkansas 72716. Walmart operates one of the largest retail chains in the world with stores throughout the United States and billions of dollars in annual sales. Walmart is one of the largest importers of consumer goods in the United States. A significant portion of the products Walmart sells are imported goods subject to IEEPA tariffs imposed by the United States government.

## FACTUAL BACKGROUND

22. Walmart is one of the largest retailers in the world and consistently ranks among the largest retail companies by global revenues, reflecting the massive scale of its operations and merchandise sales.

23. Walmart operates retail stores that sell the general public a wide range of consumer products, including groceries, electronics, appliances, clothing, household goods, furniture, sporting goods, and personal care products. Walmart also sells merchandise through online retail platforms.

24. To supply its stores with merchandise at scale, Walmart imports enormous quantities of products from foreign manufacturers and suppliers. These imports include a wide range of goods sold in Walmart stores.

25. Imported goods account for a substantial portion of Walmart's retail sales in the United States. Walmart relies heavily on international supply chains to stock its stores.

26. Because Walmart imports a significant portion of the goods it sells, the IEEPA tariffs directly increased Walmart's cost of importing merchandise into the United States.

27. Beginning in February 2025, President Trump invoked IEEPA to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade and supply-chain concerns.

28. Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately 25 percent on many imports from Canada and Mexico and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.

29. The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise, including Walmart.

30. Under U.S. Customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record, including major retailers such as Walmart, were required to pay the IEEPA tariffs to CBP upon entry of covered merchandise into the country.

31. Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.

32. On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation, invalidating the tariff orders issued pursuant to that statute.

33. The Supreme Court's decision effectively eliminated the legal basis for the IEEPA tariffs and created a pathway for importers that had paid those duties, including large retailers like Walmart, to seek refunds of tariffs previously collected by the federal government.

34. Economists and government agencies widely recognize that tariffs are largely borne by domestic consumers rather than foreign exporters or the importing firms that formally remit the duties.

35. Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.

36. When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of firms facing tariff-related cost increases passed at least some portion of those costs through to customers in the form of higher prices. Companies consider tariffs to be costs that are incorporated into the pricing structure.

37. Walmart followed this same pattern during the tariff period. As a major importer of consumer goods, Walmart faced increased costs resulting from tariffs on products sourced from foreign suppliers and took steps to address those cost pressures through pricing and merchandising decisions.

38. Walmart executives publicly acknowledged that tariffs would affect pricing decisions and the company's cost structure. In those communications, Walmart leadership explained that tariffs increased the company's merchandise costs and required Walmart to make price adjustments.

39. In May 2025, when discussing tariffs, Walmart's Chief Financial Officer stated, "We're wired for everyday low prices, but the magnitude of these increases is more than any retailer can absorb." He continued: "It's more than any supplier can absorb. And so I'm concerned that consumer is going to start seeing higher prices. You'll begin to see that, likely towards the tail end of this month, and then certainly much more in June."

40. In August 2025, Walmart's Chief Executive Officer stated in an earnings call, "We've continued to see our costs increase each week, which we expect will continue into the third and fourth quarters."

41. In February 2026, Walmart's Chief Financial Officer stated, "Tariff-related costs lifted prices across many categories."

42. Walmart's public statements confirmed that tariffs increased Walmart's costs of imported goods and that Walmart was making pricing and sourcing decisions in direct response to tariff-driven cost increases.

43. These admissions support the inference that Plaintiffs and Class members paid tariff-inflated prices at Walmart during the Class Period while Walmart now seeks to retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

44. Following the Supreme Court's February 2026 decision, importers that had paid IEEPA tariffs, including Walmart, became eligible to pursue refunds of those duties.

45. On March 5, 2026, the Court of International Trade, in *Atmus Filtration, Inc. v. United States*, ordered CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to "all importers of record" that paid IEEPA duties, including importers that had not filed their own refund suits.

46. The potential refund pool resulting from the invalidation of the IEEPA tariffs is enormous. Public reporting concerning refund proceedings states that CBP estimated an "unprecedented volume of refunds," potentially involving 53,173,939 refunds across 330,566 importers if each entry subject to IEEPA duties is entitled to a refund.

47. Walmart is among the country's largest importers of consumer goods and therefore stands to recover substantial sums if tariff refunds are paid. Industry rankings place Walmart among the top 100 importers in the United States.

48. Given Walmart's scale as a national retailer and major importer, Walmart can expect to recover significant tariff refunds corresponding to duties it paid during the Class Period.

According to an April 10 analysis by Citi, Walmart is due $10.2 billion in tariff refunds. Those expected refunds are significant here because Walmart previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Walmart now seeks to recover from the government duties whose economic burden was borne, in whole or in part, by Plaintiffs and Class members.

49. In practical terms, Walmart stands to receive a windfall: it has already recouped tariff costs from consumers through higher prices, and it now stands in line to recover those same unlawful tariff payments from the federal government.

50. Plaintiffs' claims arise from physical in-store purchases at Walmart retail locations and not from purchases made through Walmart.com, the Walmart app, Walmart+, Walmart Pay, Scan & Go, pickup, delivery, or other Walmart digital ordering or checkout platforms.

**CLASS ACTION ALLEGATIONS**

51. Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). This action satisfies the implicit and explicit requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

52. The proposed Class is defined as follows: All natural persons in the United States who, during the period February 1, 2025, through February 20, 2026, purchased goods in person at a physical Walmart retail store, and not through Walmart.com, the Walmart mobile application, Walmart+, Walmart Pay, Scan & Go, pickup, delivery, or any other Walmart digital ordering or checkout platform, where such goods were subject to tariffs imposed under IEEPA, and who did not accept, agree to, or become bound by Walmart's online Terms of Use, Walmart+ Terms, or any other Walmart arbitration agreement or class-action waiver covering disputes relating to Walmart products or services.

53. Excluded from the Class are: (a) Defendant and any entities in which Defendant has a controlling interest; (b) Defendant's officers, directors, and employees; (c) any entities in which Defendant's officers, directors, or employees are employed and any legal representatives, heirs, successors, or assigns of Defendant; (d) the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; (e) all persons who properly execute and timely file a request for exclusion from the Class; (f) any attorneys representing Plaintiffs or the Class; and (g) any person reflected in Walmart's records as having accepted Walmart's online Terms of Use, Walmart+ Terms, or any Walmart arbitration agreement or class-action waiver before or during the Class Period, including through Walmart.com, the Walmart mobile application, Walmart+, Walmart Pay, Scan & Go, pickup, delivery, or other Walmart digital platforms.

54. Numerosity. The Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable through Walmart's transaction, pricing, import, and product records. Given Walmart's nationwide consumer base and the breadth of the tariff period, the Class likely numbers in the hundreds of thousands or millions of consumers.

55. Commonality. Plaintiffs' claims present questions of law and fact common to the Class, and resolving these questions will resolve central issues in the litigation for all Class members.

56. Common questions include, without limitation: (a) whether Walmart paid tariffs imposed under IEEPA on imported goods during the Class Period; (b) whether Walmart increased retail prices on goods sold to consumers in response to those tariffs; (c) whether Walmart passed through some or all tariff costs to consumers through higher retail prices; (d) whether Walmart

sought or will seek refunds of those tariffs from the federal government; (e) whether Walmart's retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment; and (f) the proper measure of restitution, damages, declaratory relief, or other relief resulting from Walmart's conduct.

57. Typicality. Plaintiffs' claims are typical of the claims of Class members because Plaintiffs, like Class members, purchased goods from Walmart at physical Walmart stores during the Class Period and paid tariff-inflated prices on goods subject to tariff-related price increases.

58. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no disabling conflicts of interest antagonistic to the Class. Plaintiffs seek no relief antagonistic or adverse to Class members. Plaintiffs are represented by experienced and able counsel.

59. Predominance. Common questions of law and fact predominate over any questions affecting only individual members. The central issues concern Walmart's uniform tariff-related pricing conduct, Walmart's tariff payments, Walmart's eligibility for tariff refunds, Walmart's retention of those refunds, and the appropriate classwide method for calculating restitution or damages.

60. Superiority. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class treatment will permit a large number of consumers to prosecute common claims in a single forum efficiently and without duplicative evidence, effort, and expense. Many Class members' individual claims are modest and would be impractical to litigate individually against a large corporate defendant.

61. Certification under Rule 23(b)(2) is also appropriate because Walmart has acted or refused to act on grounds generally applicable to the Class, making final injunctive or declaratory relief appropriate with respect to the Class as a whole.

62. Plaintiffs reserve the right to modify or amend the proposed Class definition, to propose subclasses, and to modify, amend, or remove proposed subclasses before the Court determines whether certification is appropriate and as discovery develops.

63. This First Amended Complaint bears the caption "First Amended Complaint - Class Action" and includes these separate Class Action Allegations pursuant to Local Rule 23.1.

## CLAIMS FOR RELIEF

### COUNT I

### Unjust Enrichment

**(On behalf of Plaintiffs and the Class)**

64. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

65. Plaintiffs and the Class conferred a benefit upon Walmart in the form of money paid for the purchase of goods at Walmart stores, including tariff-inflated portions of the purchase prices.

66. Walmart appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and the Class.

67. Under principles of equity and good conscience, Walmart should not be permitted to retain money obtained from Plaintiffs and Class members as a result of tariff-related price increases where Walmart also receives or seeks to receive refunds of the same tariff charges from the federal government.

68. Walmart's retention of both the consumer pass-through and the governmental refund would create an inequitable windfall at consumers' expense.

69. Accordingly, Plaintiffs and the Class seek disgorgement, restitution, and all other equitable relief necessary to prevent Walmart from retaining money unjustly obtained as a result of the conduct alleged herein.

**COUNT II**

**Declaratory Relief**

**(On behalf of Plaintiffs and the Class)**

70. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

71. Federal courts have authority to declare the rights and other legal relations of interested parties. 28 U.S.C. § 2201(a).

72. An actual controversy exists as to Walmart's right to retain tariff-related overcharges paid by consumers after Walmart receives or becomes entitled to receive refunds of the same tariff payments from the federal government.

73. Plaintiffs and Class members suffered injury by paying tariff-inflated prices on Walmart products and face further injury from Walmart's retention of tariff refunds corresponding to costs borne by consumers.

74. This Court may declare that Walmart's retention of tariff refunds corresponding to tariff-related costs paid by Plaintiffs and Class members is unlawful, inequitable, or otherwise improper for the reasons alleged herein.

75. Plaintiffs and the Class seek a declaration of their rights, together with appropriate further relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class where applicable, pray for judgment against Defendant as follows:

a) For an order certifying the proposed Class, appointing Plaintiffs as class representatives, appointing Plaintiffs' counsel as class counsel, and directing notice to the proposed Class to be paid by Defendant;

b) For damages suffered by Plaintiffs and members of the proposed Class;

c) For restitution to Plaintiffs and the proposed Class of all monies wrongfully obtained or retained by Defendant;

d) For disgorgement of all tariff-related monies and benefits unjustly retained by Defendant;

e) For declaratory relief declaring that Walmart may not retain tariff refunds corresponding to tariff-related costs paid by Plaintiffs and Class members;

f) For retrospective and prospective injunctive relief as permitted by law or equity, including relief necessary to remedy Defendant's past conduct and prevent Defendant from retaining an unlawful or inequitable windfall;

g) For Plaintiffs' reasonable attorneys' fees as permitted by law;

h) For Plaintiffs' costs incurred;

i) For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

j) For a trial by jury on all issues so triable; and

k) For all other and further relief that this Court deems just and proper under equity or law, including punitive damages where available and appropriate.

Respectfully Submitted,

/s/ Nickolas W. Dunn

Charles Darwin "Skip" Davidson, ABN 73026
Nickolas W. Dunn, ABN 2019115
**DAVIDSON LAW FIRM**
724 Garland, Cantrell at State
P.O. Box 1300
Little Rock, Arkansas 72203
501.374.9977 | Telephone
501.374.5917 | Facsimile
skipd@dlf-ar.com | Email
nickd@dlf-ar.com | Email

**ATTORNEYS FOR PLAINTIFF**